## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| WILLIAM ROBERT RICHMOND, *Plaintiff*, | ) ) ) | 3:18-CV-01409 (KAD) |
| v. | ) ) | |
| F-40 RESTORATION, LLC, GULLWING MOTOR CARS, INC., CARINI CARROZZERIA, LLC, and CARINI CONSULTING, LLC, *Defendants*. | ) ) ) ) ) ) | JUNE 18, 2020 |

## MEMORANDUM OF DECSION
## RE: PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Kari A. Dooley, United States District Judge

This case represents one of those rare but unfortunate cases where although all parties ostensibly acted in good faith one is doomed to incur the losses occasioned by a bad actor, who is himself, not a party to the litigation. This action involves a claim for replevin of a rare 1934 Pierce Arrow coupe (the "Pierce Arrow") and a dispute as to its ownership. The plaintiff, William Robert Richmond, moves for summary judgment on his claim for replevin arguing that there are no triable issues of fact concerning his ownership interest in the Pierce Arrow or his right to immediate possession.  (ECF No. 54.)  The defendants, F-40 Restoration, LLC (d/b/a F-40 Motorsports), Gullwing Motor Cars, Inc., Carini Carrozzeria, LLC (d/b/a F-40 Motorsports), and Carini Consulting, LLC (collectively, the "Defendants"), who each claim an interest in the Pierce Arrow, disagree that there are no genuine issues of material fact concerning who has superior title to the

Pierce Arrow. For the reasons set forth below, Richmond's motion for partial summary judgment as to Count One of the Amended Complaint is GRANTED.[1]

**Factual Background[2]**

Robert Richmond is an antique car collector who resides in Australia. (Plf.'s SMF at ¶ 1.) In or about 2009, Richmond was referred to Gary Dicso for restoration work in the United States. (Richmond Dep. at 8–9, Ex. J to Def.'s SMF, ECF No. 59.) Richmond hired Dicso to help him purchase, restore, and prepare for shipment approximately nineteen vehicles during the course of their relationship. (*Id.* at 11–12.)

In 2010, Richmond discovered through an advertisement that the Pierce Arrow was for sale in the United States. (Plf.'s SMF at ¶ 7.) Richmond paid Dicso to inspect the Pierce Arrow and negotiate a purchase price with its seller, Glenn C. Gould, III. (*Id.* at ¶¶ 8, 13.) During these negotiations, Dicso never represented to Gould that he was the one purchasing the Pierce Arrow and, in fact, told Gould that Richmond was the purchaser. (*Id.* at ¶¶ 10–11.)[3] Gould and Dicso

---

[1] The operative complaint states two causes of action: (1) replevin and (2) conversion. Richmond's motion for summary judgment and the Defendants' opposition focus exclusively on the issue of replevin and the Defendants' affirmative defenses to that claim. Accordingly, the Court construes the motion for summary judgment as seeking partial summary judgment on only Count One of the Amended Complaint.

[2] The relevant facts are taken from Richmond's Local Rule 56(a)(1) Statement ("Plf.'s SMF") and accompanying exhibits; (ECF Nos. 54, 62); and the Defendants' Local Rule 56(a)(2) Statement ("Def.'s SMF"); (ECF No. 56); and accompanying exhibits; (ECF Nos. 59–60).

The Court observes that the Defendants repeatedly failed to cite to evidence in the records in support of their qualified admissions and denials. Rule 56(a)2 of the District of Connecticut Local Rule of Civil Procedure ("Local Rules") requires that the party opposing a motion for summary judgment respond to facts in the moving party's Local Rule 56(a)1 Statement by "admitting or denying the fact and/or objecting to the fact as permitted by Federal Rule of Civil Procedure 56(c)." Local Rule 56(c) provides that "each denial in an opponent's Local Rule 56(a)2 Statement, must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial."

The Defendants' failure to comply with Local Rule 56(c) "frustrate[s] [Local] Rule 56(a)'s purpose of clarifying whether a genuine dispute of material facts exists." *Zamichiei v. CSAA Fire & Cas. Ins. Co.*, No. 16-cv-00739 (VAB), 2018 WL 950116, at *1 n.1 (D. Conn. Feb. 20, 2018) (quoting *Liston-Smith v. CSAA Fire & Cas. Ins. Co.*, 287 F. Supp. 3d 153, 157, n.2 (D. Conn. 2017)). The Court therefore deems admitted all qualified admissions and denials that do not comply with Local Rule 56 for purposes of resolving this motion. *See* D. Conn. L. Civ. R. 56(a)(3) ("Failure to provide specific citations to evidence in the record as required by this Local Rule may result in the Court deeming admitted certain facts that are supported by the evidence in accordance with Local Rule 56(a)1. . . .").

[3] These facts are deemed admitted. *See* footnote 2, *supra*.

negotiated a $98,000 purchase price for the vehicle, which Richmond agreed to pay. (*Id.* at ¶¶ 13–14.) Richmond paid the entire purchase price directly to Gould via wire transfer. (*Id.* at ¶ 16.) After the monies were received by Gould, Dicso, at Richmond's direction, transported the Pierce Arrow to his workshop and put it in storage. (*Id.* at ¶ 17.)

Over time, the business relationship between Richmond and Dicso deteriorated until Richmond sued Dicso in the United States District Court for the District of New Jersey on September 29, 2016. (*Id.* at ¶ 18.) That action was stayed on February 8, 2017 when Dicso filed for bankruptcy. (*Id*. at ¶ 19.) During the bankruptcy proceeding, Dicso did not claim an ownership interest in any of Richmond's vehicles and he testified during a meeting of creditors that the Pierce Arrow belonged to Richmond. (*Id.* at ¶¶ 20–21.)

Nonetheless, in June of 2017, Dicso, without Richmond's knowledge, contacted Gullwing Motors, Inc. ("Gullwing") to see if it was interested in purchasing the Pierce Arrow. (*Id.* at ¶ 22.) During the negotiations, Gullwing's owner, Peter Kumar, consulted with Wayne Carini, a nationally known expert in collector motor vehicles, to determine the value of the Pierce Arrow. (*Id.* at ¶ 23.) Carini appraised the Pierce Arrow as being worth between $100,000 and $120,000. (*Id.* at ¶ 24.) Kumar negotiated a purchase price of $62,500, which was memorialized in the form of a signed bill of sale on July 6, 2017. (*Id.* at ¶ 25.) Gullwing paid a $10,000 deposit to Dicso pending his production of title to the Pierce Arrow. (Kumar Dep. at 32, Ex. P. to Plf.'s Mem., ECF No. 54.) To obtain title, Dicso located a copy of the Pierce Arrow's 1949 registration through a third party. (Plf.'s SMF at ¶ 26.) On July 24, 2017, Dicso applied for a certificate of ownership from the New Jersey Department of Motor Vehicles and received title to the Pierce Arrow in his own name. (*Id.* at ¶ 27.) Thereafter, Kumar paid the remainder of the purchase price and retrieved

3

the Pierce Arrow and title from Dicso.  (*Id.* at ¶ 28; *see also* Dicso Dep. at 17–18, Ex. K to Def.'s SMF, ECF No. 60.)

On August 9, 2017, Gullwing sold the Pierce Arrow to Carini Carrozerria LLC (d/b/a F40 Motorsport) ("F-40") for $110,000.  (Plf.'s SMF at ¶ 30.)  Around this time, RM Auctions, Inc. (d/b/a RM Sotheby's) ("Sotheby's") learned of Carini's recent purchase and became interested in acquiring the Pierce Arrow from him, as it had a client who was seeking this particular vehicle to complete his collection.  (Def.'s SMF at ¶¶ 8–9; *see also* Carini Dep. at 43–44, Ex. Y to Plf.'s SMF, ECF No. 54-3.)  Not wishing to sell the Pierce Arrow, as he intended to restore it himself, Carini demanded $250,000 for it.  (Def.'s SMF at ¶ 8; *see also* Carini Dep. at 44–45.)  To his surprise, Sotheby's agreed to purchase the vehicle for that price.  (Def.'s SMF at ¶ 8; *see also* Exs. U–X to Plf.'s Mem., ECF No. 54; Plf.'s SMF at ¶ 31.)  On October 10, 2017, Sotheby's sold the Pierce Arrow to its client for $275,000.  (Plf.'s SMF at ¶ 32.)

On June 18, 2018, Dicso informed Richmond of the sale of the Pierce Arrow.  (*Id.* at ¶ 29.)  Richmond's counsel contacted the client who had purchased the Pierce Arrow from Sotheby's and informed him of Richmond's claimed ownership of the Pierce Arrow.  (Def.'s SMF at ¶ 10.)  Because of the dispute over ownership, the client wanted to return the Pierce Arrow to Sotheby's for reimbursement of the purchase price and his restoration expenses.  (Plf.'s SMF at ¶ 33.)  Sotheby's, F-40, and Gullwing agreed amongst themselves to return the vehicle and refund monies.  (*Id.* at ¶ 34.)  Richmond asked for the Defendants to allow him to retrieve the Pierce Arrow, but they refused his requests.  (*Id.* at ¶ 37.)

F-40 is the current holder of the title procured by Dicso, and the Pierce Arrow is currently in its possession.  (Def.'s SMF at ¶¶ 1–2.)

**Legal Standard**

The standard under which courts review motions for summary judgment is well-established. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," while a dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Significantly, the inquiry being conducted by the court when reviewing of a motion for summary judgment focuses on "whether there is the need for a trial — whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id*. at 250. As a result, the moving party satisfies his burden under Rule 56 "by showing . . . that there is an absence of evidence to support the nonmoving party's case" at trial. *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam) (internal quotation marks omitted). Once the movant meets his burden, the nonmoving party "must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'" *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)). "[T]he party opposing summary judgment may not merely rest on the allegations or denials of his pleading" to establish the existence of a disputed fact. *Wright*, 554 F.3d at 266; *accord Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888 (1990). "[M]ere speculation or conjecture as to the true nature of the facts" will not suffice. *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citations omitted; internal quotation marks omitted). Nor will wholly implausible claims or bald assertions that are unsupported by evidence. *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991); *Argus*

*Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted).

In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian,* 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir. 2003)). "In deciding a motion for summary judgment, the district court's function is not to weigh the evidence or resolve issues of fact; it is confined to deciding whether a rational juror could find in favor of the non-moving party." *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 254 (2d Cir. 2002).

**Discussion**

Replevin is a statutory remedy under Connecticut law codified at Section 52-515 of the Connecticut General Statutes. *Cornelio v. Stamford Hosp.*, 246 Conn. 45, 49 (1998) ("In Connecticut, replevin proceedings are governed by statute rather than by the rules that apply to common-law actions of replevin."). In order to prevail on a claim of replevin, a plaintiff must establish that (1) the disputed item qualifies as "goods or chattels" within the meaning of Section 52–515; (2) the plaintiff has a "property interest" in the goods or chattels; (3) the plaintiff has a "right to immediate possession" of the goods or chattels; and (4) the defendant has "wrongfully detained" the goods or chattels from him. Conn. Gen. Stat. § 52-515; *see also Cornelio*, 246 Conn. at 49.

It is undisputed that the Pierce Arrow qualifies as a "good" within the meaning of Section 52-515 and that the Defendants have refused to return the Pierce Arrow to Richmond. The parties

6

dispute, however, whether Richmond can prove that he has a property interest in and right to immediate possession of the Pierce Arrow.  The Defendants further assert that Richmond's claim, even if otherwise provable, is defeated under the circumstances presented here because they have superior title to the Pierce Arrow as buyers in the ordinary course or good faith purchasers for value under Section 2-403 of Connecticut's Uniform Commercial Code ("UCC"), Conn. Gen. Stat. § 42a-2-101, *et seq*.  The Court will address each issue in turn.

### Replevin

The undisputed facts establish that Richmond purchased the Pierce Arrow from Gould for $98,000, at which point he was the vehicle's owner.  As the owner, Richmond has both a property interest in and the right to immediate possession of the Pierce Arrow.  *See Robinson v. Atterbury*, 135 Conn. 517, 520 (Conn. 1949) (concluding defendant had right to immediate possession of furniture she owned notwithstanding fact that she had used furniture to furnish plaintiff's house while they lived together).  Indeed, Dicso has repeatedly, and consistently, acknowledged under oath that the Pierce Arrow belonged to Richmond.  Dicso has further testified that he never represented to Gould that he was purchasing the Pierce Arrow; that he represented to Gould that Richmond was the party purchasing the Pierce Arrow; that in negotiating the sale with Gould he was acting as Richmond's agent; that he did not contribute any money toward the purchase of the Pierce Arrow; that Richmond never gave him permission to obtain title to the Pierce Arrow in his own name; and that Richmond never gave him permission to sell the Pierce Arrow.  The Defendants have offered no evidence that rebuts or otherwise undermines this evidence.

The Defendants nonetheless advance several arguments as to why there are genuine issues of material fact concerning Richmond's property interest in the Pierce Arrow.  Each of these arguments suffers from the same fatal flaw—each seeks to rewrite the history of the relationship

between Richmond and Dicso and recharacterize it as something neither Richmond nor Dicso have endorsed or acknowledged and, in fact, have denied.

The Defendants first assert that Dicso acquired a superior property interest in the Pierce Arrow through the investments he made in the vehicle while maintaining it over the course of several years for Richmond. First, Dicso has never asserted such a claim and to the contrary has acknowledged, under oath, that he had no interest in any of Richmond's vehicles. Moreover, the cases cited in support of this argument—*Angrave v. Oates*, 90 Conn. App. 427 (2005) and *Decorso v. Saksa*, No. HHB-CV11-5015309-S, 2011 WL 2611801 (Conn. Super. Ct. June 1, 2011)—are inapposite. Both cases involved a dispute over a dog, and, in both cases, the court concluded that the person who purchased the dog and had expended money maintaining and caring for the dog had a superior property interest in the dog notwithstanding the fact that the other party was listed on the dog's license or registration, had a relationship with the dog, and had contributed, albeit to a lesser degree, to its care. *Angrave*, 90 Conn. App. at 430–31 (concluding plaintiff had superior interest in show dog where defendant had agreed to give the dog to plaintiff in exchange for two of its puppies, had changed the dog's registration to reflect plaintiff as co-owner, and had left the dog in plaintiff's care for the majority of its life and over two years, during which time plaintiff paid for the dog's care, show fees, and medical expenses); *Decorso*, 2011 WL 2611801, at *1–2 (concluding plaintiff was not entitled to replevin of dog notwithstanding fact the dog's license listed her as owner where evidence established that plaintiff had obtained license under false pretenses, defendant purchased the dog, and defendant paid for the dog's care, training, food, medical treatment, and incidental expenses during the period she and the dog resided with plaintiff). It is apparent that neither of these cases support the argument advanced by the Defendants. Richmond, not Dicso, purchased the Pierce Arrow from Gould. Although Dicso

stored the Pierce Arrow for several years, he did so because Richmond hired him to do so, not because he believed the vehicle was his. This is clear not only from Dicso's testimony but also from the invoices Dicso sent to Richmond for the expenses he incurred and services he rendered, invoices that Richmond paid.[4] Finally, Dicso's possession of a title in his own name from the New Jersey Department of Motor Vehicles is of no moment because it was obtained under false pretenses, as both Dicso and Richmond testified that Richmond never authorized Dicso to obtain title in his own name.[5] *See Decorso*, 2011 WL 2611801, at *1–2 (denying application for replevin where plaintiff obtained license to dog under false pretenses).

The Defendants next argue that "the joint-venture-type relationship between [Richmond] and Dicso might be construed to imply title in Dicso. . . ." (Def.'s Mem. at 9, ECF No. 57.) This argument is not supported by any evidence in the record. As previously discussed, the evidence establishes that Richmond retained Dicso to acquire and restore vehicles on his behalf, and Dicso charged Richmond for those services. There is no evidence that Dicso ever made a personal investment in any of Richmond's vehicles. Moreover, Dicso has expressly disavowed ever being a partner or equity holder in Richmond's motor vehicle collecting activities and has disclaimed any ownership interest in any of Richmond's vehicles.

Lastly, the Defendants argue that it was *Dicso*, not Richmond, who purchased the Pierce Arrow from Gould. This argument is premised on the notion that "[Richmond] so thoroughly

---

[4] Towards the end of their relationship, Richmond and Dicso had a dispute concerning outstanding storage fees. It is unclear whether any of those fees are fairly attributable to the storage of the Pierce Arrow, as Dicso testified that he stored it as his house. In any event, the storage of the Pierce Arrow under the circumstances presented hardly constitutes an "investment" in the vehicle and this fact does not otherwise preclude summary judgment on the issue of replevin.

[5] The Defendants rely on Dicso's testimony that if he was going to obtain title to the Pierce Arrow, he would have had to put the title in his own name and then transfer it to Richmond because Richmond could not appear in-person to sign the necessary documents. (Dicso Dep. at 27.) Despite the Defendants suggestion to the contrary, this testimony does not establish that Dicso had a property interest in the Pierce Arrow or the right to secure title in his own name for the purpose of surreptitiously selling the Pierce Arrow for his own benefit.

deferred to [Dicso] to handle his affairs that he created the very circumstance that made obtaining title by [Dicso] in [Dicso's] own name so easy." (*Id.* at 18.)  The Defendants posit that "because [Richmond's] hands-off approach toward Dicso extended to the original transaction of sale itself, query whether it was not a theft of [Richmond's] money at the time of purchase, rather than a theft of a vehicle later in time, since Dicso was given 'power of attorney'-like authority with respect to the such [sic] transactions." (*Id.* at 8.)  This argument is specious.  Richmond and Dicso both agree that *Richmond* purchased the Pierce Arrow from Gould.  There is no evidence that Dicso ever viewed the Pierce Arrow as his own, or that he ever considered surreptitiously selling it for his own benefit prior to encountering dire financial straits *years after* the initial purchase by Richmond.  In addition, although the Defendants seize on Dicso's testimony that he had "power of attorney"-like authority over some of Dicso's vehicles, this testimony was expressly limited to those occasions when Richmond sent money to Dicso in order to permit Dicso to consummate a purchase of a vehicle on Richmond's behalf.  (Dicso Dep. at 24 (explaining that for the purchase of "[s]ome of the vehicles [Richmond] gave me the money to do and gave me the, I'll call it power of attorney for a better word, and I act as his representative here in the United States from Australia.").)  The Pierce Arrow was not purchased in this fashion.  Richmond paid Gould directly so reliance on this testimony is misplaced, if not disingenuous.  To be sure, there are steps Richmond could have, and perhaps should have, taken to protect himself from Dicso, such as better documenting his ownership interest in his vehicles in the United States.  But the notion that Dicso obtained superior title to the Pierce Arrow merely because Richmond failed to take these precautionary measures is a dubious (at best) and wholly unsupported proposition.

In sum, the Court agrees with Richmond that there are no triable issues of fact concerning his claim for replevin of the Pierce Arrow.

**Affirmative Defenses to Replevin**

The next question is whether the Defendants have a viable defense to replevin. The Defendants assert two affirmative defenses pursuant to Section 2-403 of the UCC. *See Galin v. Hamada*, No. 15-cv-06992 (JMF), 2016 WL 2733132, at *2 (S.D.N.Y. May 10, 2016) ("the weight of authority makes plain that Section 2-403 establishes an affirmative defense"). First, they argue that Dicso was able to transfer good title to the Pierce Arrow pursuant to the so-called entrustment doctrine, which enables a "buyer in the ordinary course of business" to secure good title from a "merchant" to whom the good has been entrusted. Conn. Gen. Stat. § 42a-2-403(2). Alternatively, the Defendants argue that Gullwing received good title to the Pierce Arrow under the "transaction of purchase" provision of the UCC because Gullwing was a "good faith purchaser for value." Conn. Gen. Stat. § 42a-2-403(1). Richmond argues that both defenses fail on the record evidence.

*Entrustment*

Section 2-403(2) of the UCC provides that "[a]ny entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster to a buyer in ordinary course of business." Conn. Gen. Stat. § 42a-2-403(2). A "merchant" is defined in relevant part as "a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction. . . ." Conn. Gen. Stat. § 42a-2-104(1). A "buyer in the ordinary course" is defined in relevant part as "a person that buys goods in good faith, without knowledge that the sale violates the rights of another person in the goods, and in the ordinary course from a person . . . in the business of selling goods of that kind." Conn. Gen. Stat. § 42a-2-201(b)(9).

Here, the Defendants assert that Richmond entrusted the Pierce Arrow to Dicso, a "merchant," and therefore bore the risk that Dicso, as a merchant, would then put the Pierce Arrow

11

into the stream of commerce by selling it to "a buyer in the ordinary course of business" (*e.g.*, Gullwing).  This defense raises two intertwined issues: first, whether Dicso was a "merchant who deals in goods of the kind" at issue and, second, whether Dicso was "in the business of selling goods of [the] kind" at issue.  The Defendants contend that because there is evidence that Dicso worked in the antique car industry and previously sold antique cars summary judgment on their entrustment defense is inappropriate.  Richmond disagrees, arguing that to prevail in this defense the Defendants must establish that Dicso regularly sold antique cars, which they cannot do because he did not.

There is little authority in Connecticut on the meaning of the phrases "deals in goods of the kind" and "in the business of selling goods of that kind."  The Court is nonetheless persuaded by the available authority from Connecticut and other UCC jurisdictions that these phrases are largely synonymous and require the seller to be someone who is regularly engaged in selling goods of the kind at issue.[6]

The Connecticut Appellate Court has previously agreed with the Second Circuit Court of Appeals that the definition of buyer in the ordinary course "requires, inter alia, that the buyer in ordinary course buy from a seller who ordinarily sells similar goods." *Ace Equip. Sales, Inc. v. H.O. Penn Mach. Co.*, 88 Conn. App. 687, 691 (2005) (quoting *Aircraft Trading & Servs., Inc. v. Braniff, Inc.*, 819 F.2d 1227, 1232 (2d Cir. 1987)); *see also Fin. Fed. Credit Inc. v. Teplitz Auto Parts, Inc.*, No. 01-cv-03510 (LAP), 2007 WL 2398583, at *6 (S.D.N.Y. Aug. 17, 2007) ("An

---

[6] Although the definition of merchant in Section 2-104(1) includes both a person who "deals in goods of the kind" and one who "otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction," entrustment under Section 2-403(2) occurs only where the goods are entrusted to a "merchant who deals in goods of the kind." Conn. Gen. Stat. § 42a-2-403(2) (creating entrustment defense only where the good were entrusted to "a merchant who deals in goods of that kind"); *Zaretsky v. William Goldberg Diamond Corp.*, 820 F3d 513, 520–21 (2d Cir. 2016) (construing identical provisions under New York law to limit definition of "merchant" in context of entrustment defense to "a person who deals in goods of the kind"). The Defendants' reliance upon the latter definition of "merchant" is therefore misplaced.

12

important question in determining whether the seller made the sale in the ordinary course of business is to determine if that seller engages in such an economic enterprise on a systematic basis, not merely an isolated transaction."). Courts in other jurisdictions have construed the phrase "deals in goods of the kind" in a similar fashion and required the seller or merchant to be someone "who is engaged regularly in selling goods of the kind [at issue]." *Zaretsky v. William Goldberg Diamond Corp.*, 820 F.3d 513, 522 (2d Cir. 2016) (quoting *Toyomenka, Inc. v. Mount Hope Finishing Co.*, 432 F.2d 722, 727 (4th Cir. 1970)) (collecting cases); *see also* 1 White, Summers, & Hillman, Uniform Commercial Code § 4:34 (6th ed.) ("While the description is ultimately a qualitative assessment, there is a good argument that a 'seller' should be defined as a 'merchant who deals in goods of that kind' when there is a history of similar dealings, such as evidence indicating that a seller had previously engaged in several similar transactions." [footnote omitted]).

The Court sees no reason why the Connecticut Supreme Court would adopt a different construction of these phrases. "The purpose of the merchant entrustment rule is to enhance the reliability of commercial sales by merchants who deal in the kind of goods sold by shifting the risk of resale to one who leaves his property with a merchant." *Overton v. Art Fin. Partners LLC*, 166 F. Supp. 3d 388, 400 (S.D.N.Y. 2016) (alterations omitted; citation omitted; internal quotation marks omitted). "Put differently, the theory behind the provision is that a person who knowingly delivers his property to a merchant dealing in goods of that kind assumes the risk of the merchant's acting unscrupulously by selling the property to an innocent purchaser." *Galin v. Hamada*, 283 F. Supp. 3d 189, 195 (S.D.N.Y. 2017) (citation omitted; internal quotation marks omitted), *aff'd*, 753 Fed. Appx. 3 (2d Cir. 2018) (summary order). This purpose cannot be fully served unless "the entruster know[s], or in the exercise of reasonable diligence should know, that he placed the goods with one who might reasonably appear to third persons to be a dealer in the type of goods in

question." *Perez-Medina v. First Team Auction, Inc.*, 206 Ga. App. 719, 721 (1992). By the same token, someone should not be able to claim status as a buyer in the ordinary course unless the seller is someone who regularly engages in the sale of goods of that kind. After all, "[o]ne expects to get good title when buying a shiny new car from a General Motors dealer. On the other hand, one buying goods from a mere warehouseman trying to recover storage costs knows that the seller is dealing with somebody else's goods." White, Summers, & Hillman, *supra*, § 4:34.

Applying this authority to the present case, the Court agrees with Richmond that there are no triable issues of fact with respect to the entrustment defense. There is no evidence that Dicso regularly engaged in the sale of antique cars. Dicso was in the business of car restoration, and he has specifically disavowed ever having a dealer's license or ever being in the business of selling new or used motor vehicles. Aside from the sale of the Pierce Arrow, the record reflects only one other car sale made by Dicso.[7] Notably, Dicso did not sell that vehicle as a foray into the world of antique car dealing. Rather, he sold it for the same reason he sold the Pierce Arrow; to address his significant financial troubles. Under these facts and circumstances, no reasonable jury could conclude that Dicso was a merchant "who deals in goods of the kind" at issue; Conn. Gen. Stat. § 42a-2-104(1); or that Gullwing purchased the Pierce Arrow "in ordinary course from a person . . . in the business of selling goods of that kind"; Conn. Gen. Stat. § 42a-2-201(b)(9).

Accordingly, there are no triable issues of fact concerning the Defendants' entrustment defense.[8] *See Zaretsky*, 820 F.3d at 523 (concluding defendant was entitled to summary judgment

---

[7] Specifically, in or about 2016, Dicso told Richmond that he was experiencing significant financial troubles, and Richmond gave him permission to sell two of his vehicles, his 1964 Dodge Chrysler and an Oldsmobile, both of which were worth less than $10,000. Dicso subsequently sold the 1964 Dodge Chrysler for approximately $5,000.

[8] Although the Defendants inability to prove that Dicso regularly sold antique cars is dispositive, it bears mentioning that there is no evidence that either Richmond or Gullwing would have perceived Dicso to be an antique car dealer. Richmond was referred to Dicso because of his work in antique car restoration, not sales. Kumar also testified that he had never done business with Dicso before nor was he a known entity in the antique car business. In fact, it was precisely because Dicso was unknown to him that Kumar was unwilling to pay Dicso the full purchase price of the Pierce Arrow until he produced the title.

where plaintiff "submitted no material evidence that [seller] regularly conducted . . . sales" of the kind of goods at issue).

### *Transaction of Purchase*

The Defendants next argue that even if the entrustment doctrine does not apply, they have good title pursuant to the "transaction of purchase" provision of the UCC. Section 2-403(1) of the UCC provides, in relevant part:

> A purchaser of goods acquires all title which his transferor had or had power to transfer except that a purchaser of a limited interest acquires rights only to the extent of the interest purchased. *A person with voidable title has power to transfer a good title to a good faith purchaser for value.*

Conn. Gen. Stat. § 42a-2-403(1) (emphasis added).[9] The Defendants argue that Gullwing is a good faith purchaser for value. As a result, Gullwing and the subsequent purchasers all possessed good title to the Pierce Arrow notwithstanding Dicso's lack of ownership. Richmond responds that the undisputed facts establish that Dicso stole the Pierce Arrow from him. Thus, any title Dicso had was void, not merely voidable, and Section 2-403(1) does not apply. The Court agrees with Richmond.[10]

Under Section 2-403(1), "voidable title should be distinguished from void title." White, Summers, & Hillman, *supra*, § 4:33. Section 2-403(1) is

> generally limited to those situations in which the party who delivered the goods to the subsequent seller intended, however misguidedly, that the seller would become the owner of the goods. Thus, the con artist who fraudulently induces a manufacturer to deliver goods to him by means of a forged check has voidable title

---

[9] Section 2-403(1) further provides: "When goods have been delivered under a transaction of purchase the purchaser has such power even though (a) the transferor was deceived as to the identity of the purchaser, or (b) the delivery was in exchange for a check which is later dishonored, or (c) it was agreed that the transaction was to be a 'cash sale', or (d) the delivery was procured through fraud punishable as larcenous under the criminal law." These provisions are not applicable here.

[10] Richmond also argues that the Defendants cannot satisfy any of the requirements for the status of a good faith purchaser for value. Because Dicso had void title, Section 2-403(1) does not apply and this issue does not need to be reached.

15

> because he obtained delivery through a transaction of purchase, even though the defrauded manufacturer could bring criminal charges against the con artist; under section 2-403(1), the defects in the con artist's voidable title would be cured by a sale to a good faith purchaser for value, and the good faith purchaser would obtain clear title, free from any claims of the manufacturer. But if the con artist merely converts the goods to his own use after having obtained possession of them in some manner other than through a transaction of purchase, he does not have even voidable title; instead, he has void title, and cannot pass good title even to a good faith purchaser for value.

*Zaretsky*, 820 F.3d at 525 (applying New York law) (quoting *Am. Standard Credit, Inc. v. Nat'l Cement Co.*, 643 F.2d 248, 268 (5th Cir. 1981) (applying Alabama law)); *accord Exec. Cars, LLC v. W. Funding II, Inc.*, 826 S.E.2d 370, 376, 377 n.5 (Ga. App. 2019) (reiterating that the good faith purchaser for value defense was not available where the goods were stolen and collecting cases from other jurisdictions); *Nist v. Hall*, 234 Cal. Rptr. 3d 40, 47 (Ct. App. 2018) ("An involuntary transfer (such as an out-and-out theft) results in void title, while a voluntary transfer, even if fraudulently induced, results in voidable title."); *Marlow v. Conley*, 787 N.E.2d 490, 493 (Ind. Ct. App. 2003) ("[A] 'defrauding buyer' obtains voidable title. However, a thief obtains void title."); *Kenyon v. Abel*, 36 P.3d 1161, 1166 (Wyo. 2001) ("the good faith of a purchaser is not a defense to an action for conversion under the common law or the UCC if the true owner never consented to the transfer of the goods to the person from whom the good faith purchaser bought them"); *Atlas Ins. Co. v. Gibbs*, 121 Conn. 188, 183 A. 690, 692 (Conn. 1936) ("one in possession of stolen property may not ordinarily assert any claim to it as against the owner"); *see also* White, Summers, & Hillman, *supra*, § 4:33 (discussing distinction between void and voidable title in the context of thefts and frauds).

      Here, Dicso had neither good nor voidable title at the time of the transfer to Gullwing. There is no evidence that Richmond ever intended for Dicso to become the owner of the Pierce Arrow. Rather, the undisputed evidence establishes that Dicso embezzled the Pierce Arrow from

16

Richmond.  *See* Conn. Gen. Stat. § 53a-119(1) ("A person commits embezzlement when he wrongfully appropriates to himself or to another property of another in his care or custody."); *Embezzlement*, Black's Law Dictionary (11th ed. 2019) (defining "embezzlement" to mean "[t]he fraudulent taking of personal property with which one has been entrusted"); *see also* N.J. Stat. § 2C:20-3(a) ("A person is guilty of theft if he unlawfully takes, or exercises unlawful control over, movable property of another with purpose to deprive him thereof.").  Because any title Dicso might have procured for himself was void by virtue of his embezzlement, he did not have the power to transfer good title to a good faith purchaser for value.  Accordingly, even assuming *arguendo* that the Defendants qualify as good faith purchasers for value, their title, which traces back to Dicso, remains void under Section 2-403(1).  For this reason, there are no triable issues of fact concerning the Defendants' transaction-of-purchase defense.

**Conclusion**

For the reasons set forth in this decision, Richmond's partial motion for summary judgment [ECF No. 54] is GRANTED.  Summary judgment is granted as to Count One of the Amended Complaint.

**SO ORDERED** at Bridgeport, Connecticut, this 18th day of June 2020.

 /s/ *Kari A. Dooley*  
KARI A. DOOLEY  
UNITED STATES DISTRICT JUDGE